**Fred P. GILBERT, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. M–80–314.**

Court of Criminal Appeals of Oklahoma.

July 1, 1982.

Rehearing Denied July 30, 1982.

Mary E. Bane, Oyler, Smith & Bane, Oklahoma City, for appellant.

Jan Eric Cartwright, Atty. Gen., Susan J. Talbot, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

GORDON R. MELSON, Assigned Judge:

Fred P. Gilbert, a Tulsa attorney, appeals from an Order Adjudging him guilty of Direct Contempt in Oklahoma County District Court, Case No. CJ–80–259. He was sentenced to serve six (6) months in the County Jail and pay a three thousand dollar ($3,000) fine.

## I.

### STATEMENT OF FACTS

The contempt conviction occurred in the course of proceedings held on an application for post-conviction relief before the Honorable Joe Cannon, Oklahoma County District Judge. On January 10, 1980, the appellant filed (by mail) a Motion to Disqualify Judge Cannon with the Oklahoma County Court Clerk, along with a written request that the

1. The cover letter was dated January 9, 1980, and included two copies of the Motion to Disqualify plus an extra copy and letter for Judge Parr, the Presiding Judge. The record does not reflect whether or not these copies were delivered as requested.

2. Appellant and the District Attorney's office were able to finalize an agreed disposition or-

Clerk bring a copy of the filing to the Court's attention.[1] The next day, January 11, 1980, the appellant Gilbert and an associate, William McMahon, appeared for the regularly scheduled hearing on the post-conviction relief application. Immediately before the hearing, they handed a copy of the Motion to Disqualify to Judge Cannon in his chambers, indicating they wished to present it. After reading part of it, Judge Cannon ordered the appellant not to leave the courthouse; he then convened in the open courtroom to conduct the post-conviction hearing.

Thereupon the judge asked Mr. Gilbert if he had drafted the Motion to Disqualify which bore his signature. Appellant responded affirmatively. Judge Cannon stated that, in his opinion, the document was absolutely contemptuous, and told appellant he would give him an opportunity to show cause why he should not be held in direct contempt of court.

Appellant responded by requesting that he be allowed to consult with counsel. He was permitted to call counsel, but he was placed in the temporary custody of the Sheriff and ordered not to leave the courthouse.

At the beginning of a rather short and informal hearing on the application for post-conviction relief, Judge Cannon summarily overruled the disputed Motion to Disqualify, apparently believing it to be patently in error—and contemptuous.[2] The contempt proceeding was then resumed, with counsel appearing with appellant Gilbert.

Appellant made the following contentions, all of which are also raised on appeal: First, it was argued that the matter could not properly be considered as direct contempt; second, that the Motion was not

der that was favorable to appellant's client. The record reflects the Judge's concern that the parties had already reached an agreement before appellant filed the Motion to Disqualify. We cannot say that the record supports the Judge's suspicion, since there was no final agreement until the hearing.

wilfully contemptuous but only stated certain inferences he had drawn from documentary evidence after denial of his request for a pre-trial conference to ascertain the truth or falsity of the suspect assertions; third, that Judge Cannon should disqualify himself from presiding further and have the case referred to another judge; fourth, that he be formally arraigned and provided a jury trial; and lastly, that he be permitted to call witnesses in his behalf.

All these remarks and contentions were rejected. After permitting appellant opportunities to explain the Motion to Disqualify if he so desired, Judge Cannon stated the Motion was contemptuous on its face and ruled Gilbert in direct contempt of court, and in contempt of all the judges of the Seventh Judicial District and the entire judicial system. He was sentenced to serve six (6) months in the County Jail and fined three thousand dollars ($3,000).

Gilbert's request that bond be set pending appeal was denied; later, Judge Cannon set a bond hearing for the following Monday, January 14, 1980, at 10:00 a. m. The judge further denied requests for bond pending that hearing, and directed the Sheriff to take the appellant into custody. Later that day, this Court released the appellant on bond, pending his appeal.

Thereafter, appellant filed a Motion for Judgment Notwithstanding the Order of Contempt or Alternatively a Motion for New Trial. After a somewhat unusual hearing on January 17, 1980, this Motion was overruled by Judge Cannon. From these orders, Gilbert appeals.

Since there is no evidence that appellant's outward behavior was disorderly or insolent at the hearing, or that he obstructed any on-going judicial proceedings, this Court's decision must focus on the legal significance to be attached to appellant's preparing, filing and presenting the Motion to Disqualify, the relevant portion of which reads as follows:

Episode 5. After the undersigned counsel's discovery of the results of the 'demurrer' conclave referred to under Episode 4, supra, the undersigned sent to each District Judge in Oklahoma County a letter-brief (Appendix E hereto) which detailed the substantive error in the participating judges' 'demurrers', and the procedural error of the 'secret conclave' approach to justice.

The letter-memorandum of April 21, 1979, was replete with extensive legal arguments and research, bore significant fruit in that a number of the Oklahoma County Judges later viewed their Lamb petitioners' pleadings as being essentially proper and acceptable, and from there those Judges' Lamb cases got 'moving.'

However, at a third conclave held by at least a majority of the Oklahoma County Judges, in April of 1979, they decided to retaliate personally against the undersigned attorney by filing a complaint against him with the Bar Association. See Appendix F hereto.

Actually, 'complaint' is at best a euphemism for what this majority of District Judges did, or attempted to do, to the undersigned attorney, for the 'complaint' does *not* contain any actual allegations or accusation of wrongdoing, at least not with such specificity that the judersigned [sic] could answer and rebut, and thereby clear himself. Instead, what these majority of Judges did was to send to the Bar Association that most craven and treacherous of accusations, the insinuation, or the innuendo, which fails to make any specific (and hence answerable) charge at all, but which instead *implies* some wrongdoing in such a way as to comprise a man's reputation in a way that he really can't [sic] respond, and thereby clear himself.

That *any* American public official would resort to such an insidious tacic [sic] is bad; that *Judges* would do it so absolutely unspeakable, although what more, really, should free men expect from 'government behind closed doors,' and where, true to Oklahoma County practice, the undersigned was given absolutely no notice whatsoever that his conduct was being questioned, and no opportunity whatsoever to appear, to be heard, and to confront his accusers and answer the

charges (if in fact there even were any charges of misconduct, which is extremely doubtful in view of the fact that Their Honors elected to resort to innuendo rather than plain, manful, direct English). Those majority of Judges, whoever they were, can only be taken to be personally and passionately prejudiced against the undersigned attorney personally. And, since Judge Cannon was a participant in that majority, it inescapably follows that Judge Cannon himself participates and shares in that prejudice against the undersigned attorney individually.

\* \* \* \* \* \*

*Episode 6.* On April 17, 1979, Judge Cannon denied post-conviction relief to a Lamb petitioner named Scott Cheatwood, although without notice that the case was set for hearing that day. Okla.Co., Case No. 24114. The basis of the denial was that of 'sustaining a demurrer' to the sufficiency of that petitioner's pleadings, all pursuant to Episode 4, supra. See Appendix G hereto.

It is interesting to note that while Petitioner Cheatwood's 'Lamb' petition was denied on April 17, 1979, that denial was not filed until May 18, 1979—31 days later. What a coincidence, that the time for appealing a post-conviction denial is 30 days. Thus, by the clever but corrupt expedient of keeping his denial of relief to Petitioner Cheatwood secret for 31 days, Judge Cannon sought to insulate his denial of relief in Cheatwood from appellate scrutiny, which is another way of saying that Judge Cannon was personally aware that his denial of the *Cheatwood* 'Lamb' petition was illegal. That is bad

enough; but to resort to the tactic employed by Judge Cannon to preclude Cheatwood's appeal goes beyond mere prejudice; it was instead oppression in office, tinged with judicial malice.

In one of five assignments of error, the appellant maintains that if his conduct constituted direct or indirect contempt, he was denied certain guaranteed procedural rights. Obviously, if his conduct amounted to indirect contempt, appellant was entitled to a number of procedural rights that were denied him, such as a written accusation of the charges and a jury trial. See, Art. II, § 25, Oklahoma Constitution, and 21 O.S. 1981, § 567. Furthermore, he contends that direct contempt is a crime, a misdemeanor, under previous rulings of this Court, citing *Roselle v. State*, 503 P.2d 1293, 1294–5 (Okl.Cr.1972).[3] Therefore, if he committed a direct contempt, a misdemeanor, then appellant contends he was denied certain procedural rights granted every accused misdemeanant in Oklahoma, to-wit: prosecution by written information,[4] right to trial by jury and to call witnesses on his behalf,[5] among others.

This Court disagrees with appellant's contention that contempt should be classified as a crime or criminal prosecution under the Oklahoma Constitution. In doing so, it is worthwhile to consider the sources and nature of the contempt power in Oklahoma.

## II.

### SOURCES AND NATURE OF CONTEMPT IN OKLAHOMA

■ Historically, under the common law, contempt of court was generically defined,

---

3. "... we will observe that this Court has held that direct contempt is a crime...

    \* \* \* \* \* \*

... and therefore, we conclude that the crime of contempt is a misdemeanor."

4. Art. II, § 17, of the Oklahoma Constitution provides: "No person shall be prosecuted criminally in courts of record for felony or misdemeanor otherwise than by presentment or indictment or by information...."

5. Art. II, § 20, of the Oklahoma Constitution provides: "In all criminal prosecutions, the accused shall have the right to a speedy and public trial by an impartial jury.... He shall

be informed of the nature and cause of the accusation against him and have a copy thereof, and be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his behalf. He shall have the right to be heard by himself and counsel; ...."

    Art. II, § 19, of the Oklahoma Constitution provides that the "right of trial by jury shall be and remain inviolate" except "in criminal cases wherein punishment for the offense is by fine only, not exceeding One Hundred Dollars ($100.00)."

rather than by enumeration of specific acts that would be adjudged contemptuous. As a consequence, courts had great latitude in determining the conduct to be punished as either direct or indirect contempt. See, Ricketts, *Indirect Contempt in Oklahoma,* 27 Okla.L.Rev. 213 (1974); Ricketts, *Direct Contempt in Oklahoma,* 26 Okla.L.Rev. 359 (1973). In Oklahoma, however, the contempt power is derived from and defined by constitutional and statutory provisions.

Article II, Section 25, of the Oklahoma Constitution directs the legislature to "pass laws defining contempts and regulating the proceedings and punishment" therefor, and affords *inter alia* all contemnors "an opportunity to be heard" before imposition of any penalty or punishment. Pursuant to that authorization, the Oklahoma Legislature passed 21 O.S.1981, § 565 which designated three particular types of conduct as "direct contempt" and defined "indirect contempt" as wilfully disobeying or resisting lawful court process or orders. The statute reads as follows:

> Contempts of court shall be divided into direct and indirect contempts. Direct contempts shall consist of disorderly or insolent behavior committed during the session of the court and in its immediate view, and presence, and of the unlawful and wilful refusal of any person to be sworn as a witness, and the refusal to answer any legal or proper question; and any breach of the peace, noise or disturbance, so near to it as to interrupt its proceedings, shall be deemed direct contempt of court, and may be summarily punished as hereinafter provided for. Indirect contempts of court shall consist of wilful disobedience of any process or order lawfully issued or made by court; resistance wilfully offered by any person to the execution of a lawful order or process of a court. 21 O.S.1981, § 565.

Although some earlier cases of both the Oklahoma Supreme Court [6] and this Court [7] have held that the broader common law

definitions of contempt were not entirely supplanted by the statutory definitions, later decisions of both courts have conclusively determined that the statutory and constitutional provisions not only provide the court's contempt power but also supercede and exclude the broader common law constructions of contempt. See, *Woody v. State ex rel. Allen,* 572 P.2d 241 (Okl.Cr.1977); *Smith v. State ex rel. Raburn,* 536 P.2d 976 (Okl.Cr.1975); *Fulreader v. State,* 408 P.2d 775 (Okl.1965); *Seay v. Howell,* 311 P.2d 207 (Okla.1957); *Best v. Evans,* 297 P.2d 379 (Okl.1956).

This Court and the Oklahoma Supreme Court have not always been in harmony, however, over the true nature and proper classification of contempt as civil, criminal or *sui generis.* The difference is not merely of academic interest, since the classification of direct contempt as a crime (a misdemeanor), as the appellant urges herein, could require such rights as a right to jury trial, right to call and confront witnesses and right to a written accusation.

The Oklahoma Supreme Court has rather consistently held that direct contempt proceedings "are neither civil nor criminal in character but are *sui generis...*" *Fulreader v. State,* 408 P.2d 775, 776–7 (Okl.1965). See, also, *Bd. of Governors of Registered Dentists of Okla. v. Cryan,* 638 P.2d 437 (Okl.Cr.1981); *State ex rel. Young v. Woodson,* 522 P.2d 1035, 1039 (Okl.1974); *State ex rel. Short, Att'y. Gen. v. Owens,* 125 Okl. 66, 70, 256 P. 704, 708–9 (1927). These holdings are in accord with an earlier United States Supreme Court decision that such contempts are of a criminal nature—i.e., quasi-criminal—but "they are peculiar in some respects, rightfully styled *sui generis.*" *Bessette v. Conkey,* 194 U.S. 324, 24 S.Ct. 665, 48 L.Ed. 997 (1904).

This Court, in one line of cases, has classified contempt as a crime. *Roselle v. State,* 509 P.2d 486, 488 (Okl.Cr.1973); *Roselle v. State,* 503 P.2d 1293 (Okl.Cr.1972); *Young*

---

**6.** *McKee v. DeGraffenreid,* 33 Okl. 136, 124 P. 303 (1912); *State ex rel. Short, Att'y. Gen. v. Owens,* 125 Okl. 66, 256 P. 704 (1927).

**7.** *Hosmer v. State,* 24 Okl.Cr. 312, 218 P. 164 (1923).

*v. State*, 275 P.2d 358 (Okl.Cr.1954); *Brown v. State*, 89 Okl.Cr. 443, 209 P.2d 715 (1949); *Deskins v. State*, 62 Okl.Cr. 314, 71 P.2d 502 (1937); *Ex parte Owens*, 37 Okl.Cr. 118, 258 P. 758, 804–10 (1927). However, in another line of opinions, this Court has recognized contempt as *sui generis. Roselle v. State*, 503 P.2d 1293, 1296 (1972) (Brett, dissenting); *Pate v. State*, 429 P.2d 542, 547 (Okl. Cr.1967); *Sullivan v. State*, 419 P.2d 559, 560 (Okl.Cr.1966).

While the Oklahoma Constitution guarantees a trial by jury and a written accusation or information in all criminal prosecutions,[8] a direct contemnor has no such rights unless the sentence exceeds six months in the county jail;[9] therefore, no advantage is gained in continuing to classify contempt as a crime when, procedurally, it is treated so differently. Therefore, direct contempt proceedings are to be considered neither civil nor criminal but *sui generis.* All prior holdings to the contrary on this point are overruled, including the two *Roselle* opinions, *supra.*

Consequently, there is no merit in appellant's contention that he was entitled to a jury trial and written accusation on the basis that direct contempt is a crime. That assignment of error is rejected accordingly.

### III.

### DID APPELLANT'S CONDUCT CONSTITUTE DIRECT CONTEMPT?

This is the dispositive question, and appellant maintains that it should be answered in the negative. Since it is settled that common-law definitions of contempt are inapplicable in Oklahoma, the correct answer turns on this Court's interpretation of that part of Title 21 O.S.1981, § 565, which defines direct contempt as, *"disorderly or insolent behavior committed during the session of the court and in its immediate view, or presence. . . ."* The other provisions of the statute are not pertinent to this case.

8. Article II, Sections 17, 19 and 20.

9. *Roselle v. State*, 503 P.2d 1293, 1295 (Okl.Cr. 1972), and U. S. Supreme Court cases cited

The language used by appellant in the Motion to Disqualify is, in our opinion, unprofessional and highly disrespectful. This Court emphatically condemns its use. Nevertheless, it must be determined whether its preparation, filing and submission (of a copy) to Judge Cannon constituted direct contempt under our statutory scheme.

Appellant contends that it does not, relying primarily on this Court's opinion in *Cannon v. State*, 58 Okl.Cr. 451, 55 P.2d 135 (1936), where it is stated:

The filing of an affidavit of disqualification against a trial judge in a case pending or presenting the same does not come within the purview of 'disorderly or insolent behavior committed during the session of the court, and in its immediate view and presence,' and the Court is without jurisdiction to summarily punish as for a direct contempt. *Cannon*, at 139.

As in the case at bar, the contemnor in *Cannon* filed with the Court Clerk a Motion to Disqualify the judge from hearing the case, and admitted in open court that it was his Motion, but went even further and reiterated, under oath, in open court the same allegations. The Motion asserted, *inter alia*, that plaintiff's attorney was an "advisor and dictator" to the judge and, therefore, the judge was "biased and prejudiced in favor of plaintiff and against the defendant."

Appellee counters first by citing the following cases for the proposition that scurrilous and disrespectful language contained in Motions to Disqualify or Petitions for Rehearing, filed and presented to the Court by a party and attorney, constitute direct contempt in the presence and view of the court: *Sullivan v. State*, 419 P.2d 559 (Okl. Cr.1966); *State ex rel. Short, Atty. Gen. v. Owens*, 125 Okl.Cr. 66, 256 P. 704 (1927); *State ex rel. Short, Atty. Gen. v. Martin*, 125 Okl.Cr. 51, 256 P. 667 (1927). The persuasiveness of the *Owens* and *Martin* decisions is weakened by two factors: (1) they

therein; *Ex Parte Stephenson*, 89 Okl.Cr. 427, 209 P.2d 515 (1949).

preceded *Cannon, supra,* by some nine years and thus could be considered as overruled by implication, and (2) they were influenced to some extent by the now abandoned belief that "the statutory definition of direct contempt does not exclude other forms of contempt known as the common law." *Owens, supra,* 256 P. at 716.

As for the *Sullivan* decision, *supra,* it did not even consider the issue of whether the language in the Petition for Rehearing or Motion for New Trial was direct contempt. The sole question in *Sullivan* was whether the defendant was denied due process by not having "an opportunity to be heard" in his defense. Therefore, appellee's reliance on *Sullivan* is misplaced.

It is next argued by appellee that handing over a copy of the Motion to Judge Cannon in chambers sufficed to bring appellant's conduct within "the immediate view and presence" of the court. Therefore, *Cannon* could be distinguished from this case because the pleading there was filed with the Clerk who subsequently gave it to the judge, whereas, here the contemnor directly handed a copy of the filed motion to the judge. Such reasoning, however, merely creates a distinction without any substantive difference, since in both situations the motions were filed for the purpose of having them brought before the court for consideration. Surely, a decision of this case should not hinge on whether it was the Clerk or counsel who handed Judge Cannon a copy of the filed motion.

Assuming *arguendo* that the contents of the motion are contemptuous, it must then be determined if the appellant's *conduct* in preparing, filing and presenting a copy of it occurred, as required by 21 O.S.1981, § 565, within the court's "immediate view and presence..." Generally, the use of the summary power of direct contempt is properly justified only if the judge actually witnesses the misconduct considered contemptuous. There are a few instances, however,

where contempt may occur in the court's "immediate view and presence," even though the judge does not actually perceive it himself. See, *Woody v. State ex rel. Allen,* 572 P.2d 241 (Okl.Cr.1977); *Moss v. Arnold,* 63 Okl.Cr. 343, 75 P.2d 491 (1938). In those limited situations, due process would undoubtedly require that the alleged contemnor be permitted to call witnesses to rebut the testimony on which the judge was relying but did not personally observe. But that is not the situation here.

Before adjudging Gilbert in direct contempt, Judge Cannon deemed it necessary to bring him into open court and obtain his admission that he drafted the Motion. Apparently, it was not until this subsequent examination of appellant that the judge was satisfied, beyond a reasonable doubt, that the appellant had drafted the Motion. Hence, Gilbert's actual *drafting* of the instrument—which unquestionably occurred outside the presence of the Court—was crucial in the determination of contempt.

■ Therefore, the matter of critical importance is whether *all* the acts, or essential elements, constituting the alleged contempt occurred "in the immediate view and presence" of the court while in session. If only some of the elements of the total contempt occurred in the immediate presence of the court (the so-called "hybrid" situation), then there can be no finding of direct contempt. *Johnson v. State,* 599 P.2d 416, 418 (Okl.Cr. 1979); *Roselle v. State,* 509 P.2d 486, 488 (Okl.Cr.1973). This test is in accord with Oklahoma's rejection of common-law definitions of contempt, as well as the well-accepted rule that statutes imposing penal sanctions should be strictly construed. See *State v. Humphrey,* 620 P.2d 408 (Okl.Cr. 1980); *State ex rel. Thompson v. Ekberg,* 613 P.2d 466, 468 (Okla.1980). It is also in keeping with the trend in recent years toward viewing summary contempt with disfavor and narrowly restricting its use.[10]

---

10. See generally, R. Goldfarb, *THE CONTEMPT POWER,* 180-1. See also, Goldfarb, *The Constitution and Contempt of Court,* 61 Mich.L.Rev. 283 at 296. ("The contempt power is an extraordinary remedy, an exception to our tradition of fair and complete hearings. Its use should be carefully restricted....") *Accord, Fisher v. Pace,* 336 U.S. 155, 167, 69 S.Ct. 425, 430, 93 L.Ed.2d 569 (1949) (Murphy, J., dissenting). See also, *Farese v. United States,* 209

■ Applying this test to the case at bar, it is obvious that the Motion in question was not drafted or filed in the immediate presence of the Court. *Only the delivery of a copy of the Motion occurred in the Court's view and presence.* The drafting, filing and presenting of the Motion to the Court were all required before the alleged contempt was completed. Since the record reflects the delivery of the copy to Judge Cannon did not in itself cause any disruption or disorder in the court's proceedings, or that the appellant displayed any insolent behavior or insulting demeanor at the hearing, the misconduct cannot constitute direct contempt under Oklahoma's statutory and constitutional system. (Okl.Const., Art. II, § 25; and 21 O.S.1981, §§ 565–568). Therefore, Judge Cannon's order adjudging the defendant guilty of direct contempt must be reversed and the case remanded.

In so holding, this Court in no manner condones the use of such language in pleadings; nor does it lack sympathy for the judge's position. Undoubtedly, Judge Cannon was thoroughly exasperated by what he considered an unjustified and unprofessional attack on him and his colleagues. As any judge with trial court experience realizes, occasionally a case arises when the overzealousness and outright disrespect of counsel can cause righteous wrath and anger to overcome normal tolerance and equanimity. But invoking the summary power of direct contempt may not always be the correct response where no clear-cut obstruction of the administration of justice is manifest.

The United States Supreme Court, in *In re Little*, 404 U.S. 553, 92 S.Ct. 659, 30 L.Ed.2d 708 (1972), found that "Petitioner made statements that the court was biased and had prejudged the case and that petitioner was a political prisoner." The trial court's order recited that the court felt, "... these remarks were very disrespectful

and tended to subvert and prevent justice.... that they reflected on the integrity of the Court and tended to subvert and prevent justice." (*Id.* at p. 554, 92 S.Ct. at p. 660.)

Nevertheless, the high court reversed, and cited *Craig v. Harney*, 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546 (1947) that the "law of contempt is not made for the protection of judges who may be sensitive ... Judges are supposed to be men of fortitude, able to thrive in a hardy climate." The court also recalled the words of caution in *Brown v. U. S.*, 356 U.S. 148, 153, 78 S.Ct. 622, 626, 2 L.Ed.2d 589 (1958), that trial courts "must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice."

It is the argument of the appellee, and the view of the dissenting Judge herein, that a restrictive reading of the summary contempt power will undermine the respect and dignity needed to ensure solemnity of judicial proceedings. We disagree. As one authority stated, "Where nothing more than disrespect or discourtesy is involved ... the dangers of abuse of contempt power may outweigh the benefits of using that power." Dobbs, *Contempt of Court: A Survey*, 56 Cornell L.Rev. 183, 208 (1971). In addition, one empirical study has shown that the summary contempt power plays little, if any, part in deterring attorney misbehavior. N. Dorsen L. Friedman, *DISORDER IN THE COURT*, 232–238 (1973).

With respect to the lessening of the dignity of the court, Max Radin wrote: "Judicial dignity is an important element of our system and serves a real legal function." But, he further noted, "It is, however, not a legal duty to be well mannered and it may even be said that it would be unconstitutional to make it one.... there is no reason why the dignity of the court should take such dimensions or assume such a character

F.2d 312, 315 (1st Cir. 1954) ("The grant of summary contempt power ... is to be grudgingly construed so that the instances where there is no right to a jury trial will be narrowly restricted to the bedrock cases where the concession of drastic power to the courts is necessary to enable them to preserve ... authority

... order ... decorum ..."); *United States ex rel. Robson, v. Oliver*, 470 F.2d 10, 13 (7th Cir. 1972) (where the court indicated that trend has been to limit the summary contempt power vested in courts to the least possible power adequate to prevent actual obstructions of justice.)

that it demands awe or veneration. There is no *crimen laesae majestatis* in the United States...." (quoted in Dobbs, *Contempt of Court: A Survey*, supra, p. 208, footnote 90.)

## IV.

### PROCEEDINGS ON REMAND

Our decision does not necessarily preclude some other action against the appellant for the use of such language in the pleadings. Certainly, professional discipline for violation of the Code of Professional Responsibility is a distinct possibility. In addition, the trial court may wish to consider whether indirect contempt proceedings are a legal possibility. In that connection, however, the pertinent language of 21 O.S.1981, § 565, does not seem to apply:

> ... Indirect contempts of court shall consist of wilful disobedience of any process or order lawfully issued or made by court; resistance wilfully offered by any person to the execution of a lawful order or process of court.

In view of the abrogation of common-law definitions of contempt in Oklahoma, heretofore referred to, it would be virtually impossible to apply these provisions to the facts of this case, unless—by properly issued court order—the trial court has promulgated a court rule(s) prohibiting the filing of instruments containing insulting, disrespectful or contemptuous language.[11]  A number of trial courts, as well as this Court (Rule 3.7), have adopted such rules which are binding on attorneys or other persons filing pleadings before them. Accordingly, if the trial court has such a rule, it will have thirty (30) days to determine if appellant wilfully violated such rule and to institute indirect contempt proceedings thereunder; if not, then the case is ordered dismissed at the end of that period.

Appellant's conviction for Direct Contempt of Court is hereby REVERSED AND REMANDED, to be disposed of in a manner not inconsistent with the above statement.

The Honorable HEZ J. BUSSEY filed his disqualification in the above styled and numbered matter, and the Honorable GORDON R. MELSON, District Judge of the Twenty-Second Judicial District, was appointed to serve in his stead.

BRETT, P. J., concurs.

CORNISH, J., dissents.

CORNISH, Judge, dissenting:

I must respectfully dissent to the majority's conclusion that the appellant's conduct cannot be labeled as either direct or indirect contempt. I find attorney Gilbert's conduct comes within the purview of direct contempt.

On January 11, 1980, the appellant appeared before Oklahoma County District Judge Joe Cannon, pursuant to a hearing on an application for post-conviction relief. Prior to the post-conviction hearing, Mr. Gilbert presented personally to Judge Cannon a written motion to disqualify, which was immediately read by Judge Cannon in his chambers. Thereafter, the parties convened in the courtroom to conduct the post-conviction hearing.

The trial judge requested that Mr. Gilbert approach the bench and inquired whether he had drafted the motion to disqualify. He acknowledged that it was his motion. Mr. Gilbert was then informed by the judge that the motion was contemptuous, and then advised him why he should not be held in direct contempt of court.

In response, the appellant requested a consultation with counsel before making any statements. His request was granted. Later that day, after Mr. Gilbert had an opportunity to consult with an attorney, the contempt proceeding was resumed.

I find the central issues on appeal to be twofold. First, did the attorney's actions constitute direct or indirect contempt?

---

11. The authority for adoption of such rules is set out in Rule 8, Rules on Administration of Courts, Title 20, O.S.1981, ch. 1, App. 2.

Second, should the trial judge have disqualified himself from the contempt proceeding?

## DIRECT OR INDIRECT CONTEMPT

The Oklahoma Constitution mandates that no penalty or punishment can be imposed in any contempt proceeding "until an opportunity to be heard is given." Okla. Const., art 2, § 25. Unlike many jurisdictions and the federal constitution, the Oklahoma Constitution affords a contemner an opportunity to be heard in all criminal contempt proceedings.

The Oklahoma Legislature, pursuant to the authorization given by the Oklahoma Constitution, has divided contempt of court into two categories: direct or indirect contempt, Okla.Const., art. 2, § 25. The statute provides:

> Contempts of court shall be divided into direct and indirect contempts. Direct contempts shall consist of disorderly or insolent behavior committed during the session of the court and in its immediate view, and presence, and of the unlawful and wilful refusal of any person to be sworn as a witness, and the refusal to answer any legal or proper question; and any breach of the peace, noise or disturbance, so near to it as to interrupt its proceedings, shall be deemed direct contempt of court, and may be *summarily* punished as hereinafter provided for . . . 21 O.S.1981, § 565.

Direct contempt is defined as disorderly or disrespectful behavior committed in the *immediate presence of the court while in session.* (Emphasis added). *Champion v. State,* 456 P.2d 571 (Okl.Cr.1969). It is conduct which offends the dignity and authority of the court or judge creating a threat to the orderly administration of the court. The judge must have the power to immediately suppress such behavior or the integrity of our judicial system would be in peril.

In *Offutt v. United States,* 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954), the Supreme Court succinctly stated:

> The pith of this rather extraordinary power to punish without the formalities required by the Bill of Rights . . . is that the necessities of the administration of justice require such summary dealing with obstructions to it. It is a mode of vindicating the majesty of law, in its active manifestation, against obstruction and outrage. The power thus entrusted to a judge is wholly unrelated to his personal sensibilities, be they tender or rugged. . . .

> \*   \*   \*   \*   \*   \*

> . . . The vital point is that in sitting in judgment on such misbehaving lawyer the judge should not himself give vent to personal spleen or respond to a personal grievance. These are subtle matters, for they concern the ingredients of what constitutes justice. Therefore, *justice must satisfy the appearance of justice, supra.* (Emphasis added.)

Therefore, as this Court has consistently stated, direct criminal contempt may be punished in a summary fashion, provided that the contemner is given an opportunity to explain his conduct. *Sullivan v. State,* 419 P.2d 559 (Okl.Cr.1966); *In re Young,* 325 P.2d 85 (Okl.Cr.1958); *Deskins v. State,* 62 Okl.Cr. 314, 71 P.2d 502 (1937).

I find that the mode and extent of the hearing is entrusted to the sound discretion of the trial court. It must be noted, however, that this summary hearing should seldom be invoked. In some instances it might be appropriate where the contemptuous conduct occurs in "open court" in the presence of the jury, other officers of the court, or the public; or where the contemner displays gross disrespect for the judicial system while court is in session. Generally, the direct criminal contemner should be afforded an opportunity to fully explain and defend his conduct at a formal hearing. But see *Nuckols v. Van Wagner,* 511 P.2d 1110 (Okl.Cr.1973).[1]

---

1. This case erroneously relies upon *Cooke v. United States,* 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925), in determining what due process is required in a direct contempt proceeding. *Cooke,* however, was an indirect contempt proceeding.

This summary hearing, hesitantly permitted in direct criminal contempt proceedings to enable the courts to carry out their duties, is not sanctioned in indirect contempt proceedings. In an indirect contempt action, the full panoply of constitutional protections attach. The contemner may only be punished upon the filing of an affidavit, complaint or information, written notification of the charges, a reasonable time to prepare a defense, and a jury trial, if requested. Okla.Const., art. 2, § 25; *Cannon v. State*, 58 Okl.Cr. 451, 55 P.2d 135 (1936). He must not be deprived of his liberty or property without due process of law.

Indirect contempt encompasses any "wilful disobedience of any process or order lawfully issued or made by court; resistance wilfully offered by any person to the execution of a lawful order or process of a court." 21 O.S.1981, § 565. In *Pryor v. State*, 48 Okl.Cr. 91, 290 P. 345 (1930), this Court stated that indirect contempt is conduct which tends to "obstruct and embarrass or prevent the due administration of justice, done at a distance, and not during the session of the court and in its immediate view and presence."

The initial inquiry is whether Mr. Gilbert's conduct constituted direct or indirect contempt. The appellant cites *Cannon v. State, supra*, in support of his contention that this is an action of indirect contempt. However, *Cannon* involved a contempt proceeding based upon a contemptuous motion to disqualify, which had been filed with the court clerk and indirectly reached the court through the court clerk. In that case, we held that the filing of the motion constituted an act of indirect contempt. In this case, the alleged contemptuous act is based upon the appellant's personally handing to the judge in chambers his motion to disqualify. This alleged contemptuous act was committed in the immediate presence of the court by the contemner, and falls within the purview of 21 O.S.1971, § 565, pertaining to direct contempt. The actual transfer of this written contemptuous motion is an act of insolence and disrespect before the court.

On this point, I disagree with the majority opinion's reliance upon *Roselle v. State*, 509 P.2d 486 (Okl.Cr.1973). The majority states that "the matter of critical importance is whether *all* the acts, or essential elements, constituting the alleged contempt occurred 'in the immediate view and presence' of the court while in session. Applying this test, the majority tenuously concludes that because only the delivery of the motion occurred in the presence of the court the misconduct cannot constitute direct contempt. The majority further asserts that "[t]he drafting, filing and presenting of the motion to the court were all required before the alleged contempt was completed."

I find that all the essential elements of the alleged contempt were done in the presence of the court. In my opinion the actual delivery of the alleged defamatory motion to the trial judge is the essential element of the contempt. All officers of the court are responsible for the contents of any motion they present or file with the court. Especially where the attorney has signed the motion, he should be presumed to have read and understood the contents of the motion presented to the court.

Therefore, the facts presently before this Court are distinguishable from the situation in *Cannon v. State*, supra. In *Cannon* the contemptuous motion was filed with the court clerk and delivered to the trial judge through a third party. In *Cannon* the trial judge could not be sure who had actually written the motion at the time he read it. The motion could have been written by anyone, i.e., someone could have forged the alleged contemner's name. Therefore, all the essential facts were not known to the trial judge at the time he read the motion. In this case, the accused personally delivered the motion to the trial judge and acknowledged that it was his motion. I find these distinguishing facts sufficient to constitute direct contempt.[2]

The majority further finds that because "the delivery of the copy to Judge Cannon

---

**2.** For an excellent discussion of this particular issue see Annot. 70 A.L.R.3d 797 (1976).

did not in itself cause any disruption or disorder in the court's proceedings, the misconduct cannot constitute direct contempt under Oklahoma's statutory and constitutional system." The majority opinion seems to wholly ignore the clear and unequivocal statutory language defining direct contempt. 21 O.S.1981, § 565, which provides: "Direct contempts shall consist of disorderly *or insolent behavior* committed during the session of the court and in its immediate view. . . ." (Emphasis added.) The statute does not require disruption or disorder to occur in every direct contempt case. Insolent behavior during the session of the court and in its immediate view, even in chambers, is sufficient to support a direct contempt proceeding. The majority further states that the language in the motion to disqualify is "unprofessional and highly disrespectful." Therefore, I believe that even under their view, this case can be classified as insolent behavior. In *Champion v. State,* supra, 456 P.2d at 572, this Court defined disorderly or insolent behavior as "tumultuous, insulting or disrespectful conduct." Applying this definition, I am unable to fathom the majority's conclusion that the conduct at bar cannot constitute direct contempt.

Gilbert additionally argues that the motion was not presented to the court while the court was in session. In *Woody v. State ex rel. Allen,* 572 P.2d 241 (Okl.Cr.1977), this Court defined "in session" as that period of time during a court term in which the court engages in the transaction of its proper business. We necessarily find that the court, in this case, was "in session."

Having concluded that this was a direct contempt proceeding, I find it necessary to determine whether the appellant was given an adequate opportunity to be heard. Precisely what type of hearing is required to satisfy due process in contempt proceedings has caused much confusion and inconsistency in past decisions of this Court. I perceive that the phrase "an opportunity to be heard" must be defined by the type of contempt proceeding which is before the trial court. The record shows that at the beginning of the proceeding, Judge Cannon

inquired: "All right, Mr. Gilbert. I have gone over your motion that you handed me personally, and read it. I ask you again, do you have any reason you want to tell me why I should not hold you in direct contempt of court?" The record establishes that Mr. Gilbert did not attempt to explain the motion.

In *State ex rel. Young v. Woodson,* 522 P.2d 1035 (Okl.1974), the Oklahoma Supreme Court adopted the American Bar Association Standards relating to the function of the trial judge with respect to contempt. This Court adopted the ABA standards in *Smith v. State ex rel. Raburn,* 536 P.2d 976 (Okl.Cr.1975). Section 4 of the ABA Standards provides that:

> Before imposing any punishment for [direct] contempt, the judge should give the offender notice of the charges and at least a *summary* opportunity to adduce evidence or argument relevant to guilt or punishment. (Emphasis added.)

Even in a summary proceeding, some minimal opportunity to present evidence in defense or mitigation is required. I find that the trial court did comport with the ABA Standard. The contemner was given an opportunity to present argument in his behalf. He was allowed a reasonable time to consult with counsel, prepare a defense, and explain his actions. The trial court was not required to afford him a jury trial. *See,* Okla.Const., art. 2, § 25.

A judge is not required to punish the contemner instantly. He may delay the contempt proceeding for a short time in order to avoid a disruption or delay in matters pending before the court. I caution, however, that summary contempt is inappropriate when there is no compelling need for an immediate remedy. This Court should closely scrutinize the use of summary contempt. *See, Harris v. United States,* 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965); and *Contempt Proceedings As Violating Due Process,* 39 L.Ed.2d 1031 (1965). In this case, I find that attorney Gilbert was afforded an adequate opportunity to be heard.

## DISQUALIFICATION

The appellant next asserts that Judge Cannon should have disqualified himself from the contempt proceeding. Section 5 of the ABA Standards states:

The judge before whom courtroom misconduct occurs may impose appropriate sanctions, including punishment for contempt, but should refer the matter to another judge, if his conduct is so integrated with the contempt that he contributed to it or was otherwise involved, or his objectivity could reasonably be questioned.

The trial judge has a duty to assure that every person coming before his court is given a fair and impartial proceeding. Where the contempt involves personal criticism or antagonism toward the judge, that judge must not allow his personal feelings to interfere with his duty of utmost impartiality. Generally, the substitution of another judge is required. *Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1970). However, when the contemptuous behavior is designed to remove the judge from the case for ulterior reasons, the judge must enforce his authority and condemn such behavior. *Cooke v. United States*, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925).

This case presented a difficult situation for any judge. Judge Cannon was faced with disparaging allegations upon his judicial character and that of his colleagues. At the same time, he had a duty to enforce the integrity of his office and the respect for the judicial system. Whenever possible the trial judge should refer the matter to a disinterested judge. The fact that Gilbert's motion accused the trial judge of "oppression in office, tinged with judicial malice" even though unfounded, would tend to integrate the trial judge personally into this legal fray. Under the present facts, I believe that Judge Cannon or any other trial judge should have disqualified himself from the direct contempt proceeding.

I am not unmindful that every attorney is under an obligation to his client to seek the disqualification of any judge who: (1) has an interest in the litigation, (2) entertains some bias or prejudice; (3) is related to one of the parties; (4) is unable to remain fair and impartial. See 20 O.S.1981, § 1401. However, this right to seek disqualification has its boundaries. The motion to disqualify must be made in good faith and presented in a respectful and professional manner by any officer of the Oklahoma court system.

In reviewing a motion to determine whether it is actually contemptuous, the trial judge must strike a delicate balance between the attorney's duty to zealously represent his client and the need to uphold the respect and dignity of our adversarial system. Any judge charged with weighing these competing interests must be free of bias or impartiality. Therefore, a judge who has been personally attacked, accused of judicial misconduct, whenever possible should disqualify himself from the subsequent direct contempt proceedings.

The United States Supreme Court in *Mayberry v. Pennsylvania*, supra, appropriately observed:

Generalizations are difficult. Instant treatment of contempt where lawyers are involved may greatly prejudice their clients but it may be the only wise course where others are involved. Moreover, we do not say that the more vicious the attack on the judge the less qualified he is to act. A judge cannot be driven out of a case. Where, however, *he does not act the instant the contempt is committed, but waits until the end of the trial, on balance, it is generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place.* What Chief Justice Taft said in *Cooke v. United States*, 267 U.S. 517, 539, 45 S.Ct. 390, 395, 69 L.Ed. 767, is relevant here:

The power of contempt which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court, is most important and indispensable. But its exercise is a delicate one and care is

needed to avoid arbitrary or oppressive conclusions. This rule of caution is more mandatory where the contempt charged has in it the element of personal criticism or attack upon the judge. The judge must banish the slightest personal impulse to reprisal, but he should not bend backward, and injure the authority of the court by too great leniency. The substitution of another judge would avoid either tendency but it is not always possible. Of course where acts of contempt are palpably aggravated by a personal attack upon the judge in order to drive the judge out of the case for ulterior reasons, the scheme should not be permitted to succeed. But attempts of this kind are rare. All of such cases, however, present difficult questions for the judge. All we can say upon the whole matter is that where conditions do not make it impracticable, or where the delay may not injure public or private right a judge called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place. (Emphasis added)

In this case, the trial judge and his brethren on the bench were personally attacked and scandalized by the motion. He waited until later that afternoon to commence the contempt proceeding. I would conclude that the trial judge should have asked a fellow judge to conduct the direct contempt proceeding. I would vacate the judgment of contempt and direct that another judge, not implicated in the motion, hear Gilbert's direct contempt proceeding.

In summation, I cannot lend my support to the majority's conclusion that Gilbert's conduct does not fall within the clearly defined statutory scheme of either direct or indirect contempt. Surely this attorney's conduct is not mired in a state of limbo under the guise of a legislative void. The majority's position is tenuous. It dilutes the ability of the trial courts of this state to ensure solemnity of judicial proceedings and to impose sanctions for contempt. It

appears to this writer the Oklahoma contempt statute has been radically amended through judicial fiat.

My brothers on the trial bench must have the mechanism to enforce the respect and dignity under our judicial system. Absent the ability to effectively deal with recalcitrant and insolent behavior, our orderly system of justice will be subjected to disrespectful conduct.