Pamela INGRAM, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. M–82–169.

Court of Criminal Appeals of Oklahoma.

Aug. 31, 1982.

Richard Vallejo, Oklahoma City, for appellant.

Jan Eric Cartwright, Atty. Gen., Susan Talbot, Asst. Atty. Gen., Chief, Appellate Criminal Div., Oklahoma City, for appellee.

## OPINION

CORNISH, Judge:

Pamela Ingram was cited for direct contempt of court before the Honorable Joe Cannon, Oklahoma County District Judge. She was sentenced to six (6) months' in the county jail.

On December 1, 1981, Pamela Ingram was present in Judge Cannon's courtroom during a post-conviction application hearing. While the hearing was in progress Pamela Ingram stood up in the back of the courtroom and the following colloquy transpired:

PAMELA INGRAM: Excuse me, Judge.

THE COURT: What?

PAMELA INGRAM: Excuse me. I'm a witness. I didn't get to tell my part.

THE COURT: You sit down. Either sit—sit down and don't you ever interrupt me again. You understand that? Don't interrupt me. You leave the courtroom or I'm going to have this sheriff take you to jail.

PAMELA INGRAM: You ain't taking me—taking me nowhere. I'm leaving.

THE COURT: I told you to be quiet. You utter one more word and I'm going to hold you in contempt of court. Say one word and you're in contempt. One word.

PAMELA INGRAM: I'm gonna get him. I'm gonna get him. I'm gonna get (inaudible)—

\*    \*    \*    \*    \*    \*

THE COURT: Go get her, Sheriff. I heard her. Go get her and bring her back in here.

A short time later, Ms. Ingram was returned to Judge Cannon's courtroom. The judge ordered the deputy sheriff to hold Ms. Ingram in custody until he concluded the post-conviction relief hearing. At the conclusion of the hearing the trial judge conducted Ms. Ingram's direct contempt proceeding.

The trial judge conducted a summary hearing in which he allowed Ms. Ingram to explain her behavior. The record reveals the following discussion:

THE COURT: Do you have any reason why I shouldn't put you in jail for contempt of this court; do you want to say anything—

PAMELA INGRAM: Hum-um.

THE COURT: —besides what you've just said?

PAMELA INGRAM: I left the courtroom. You asked me to leave out and I—

THE COURT: What did you say when you went out the door?

PAMELA INGRAM: What did I say when I went out the door?

THE COURT: Um-hum.

PAMELA INGRAM: I didn't say anything.

THE COURT: I sent the deputy after you. What did you say? Did you say, "I'm going to get him"?

PAMELA INGRAM: Yeah. I said it; but how could I get you? What could I do to you? Nothing.

THE COURT: You did say it, didn't you?

PAMELA INGRAM: Yeah; I said it.

THE COURT: That's what I thought. At least you're honest, now. Anything else you want to tell me?

PAMELA INGRAM: No. Just that I was raising my—what I wanted to be excused for.

THE COURT: I'm going to tell you what I'm going to do. Anybody that would tell a judge of this court—not Joe Cannon; you don't worry me a bit—but anybody that would stand up in an open courtroom in this State and tell the judge, I'm going to get you, it will be the judgment and sentence of this Court you serve six months in the county jail.

Take her away, Sheriff.

That will be the last time you ever tell another judge in this State you're going to get him in his own courtroom. And when you get through out [sic] of that six months, you still got that kind of a thought, I'm down here every day, any time you want to test me, young lady.

This Court will address two issues raised by the appellant: (1) Was the appellant denied due process of law by the summary procedures followed by the trial court?; and (2) should the trial judge have disqualified himself from the contempt proceeding? We find both contentions to be without foundation.

We first note that the appellant does not argue whether her conduct was in fact contemptuous. Therefore, we will not address this issue.

■ In determining whether a contemner has been afforded due process of law it is imperative to define whether the contemner's conduct amounted to direct or indirect contempt. In this case, we find that Ingram's conduct can properly be classified as direct contempt.

Article 2, Section 25 of the Oklahoma Constitution grants the legislature the authority to enact laws defining contempt. The Oklahoma Legislature exercised this authority by enacting Title 21, Section 565 of the Oklahoma Statutes. Section 565 divides contempts of court into two categories; direct and indirect contempt, and defines them as follows:

... Direct contempts shall consist of disorderly or insolent behavior committed during the session of the court and in its immediate view and presence, and of the unlawful and willful refusal of any person to be sworn as a witness, and the refusal to answer any legal or proper question; and any breach of the peace, noise or disturbance, so near to it as to interrupt its proceedings, shall be deemed

direct contempt of court, and may be summarily punished as hereinafter provided for. Indirect contempts of court shall consist of willful disobedience of any process or order lawfully issued or made by court; resistance willfully offered by any person to the execution of a lawful order or process of a court.

■ Direct contempts consist of disorderly or insolent behavior committed in the immediate presence of the court while in session. The courts' power to hold persons in direct contempt enables them to maintain the dignity and authority of the judicial system necessary for the proper and orderly administration of the court. See, *Champion v. State,* 456 P.2d 571 (Okl.Cr. App.1969).

■ In this case, we find that the appellant's remarks evidenced a grave disrespect for the trial court and the judicial process. This behavior occurring in the immediate presence of the court while in session, was sufficient to warrant a direct criminal contempt citation.

The crucial determination is whether the trial court afforded the appellant an adequate opportunity to be heard as required by Article 2, Section 25 of the Oklahoma Constitution. Our constitution mandates that "[i]n no case shall a penalty or punishment be imposed for contempt, until an opportunity to be heard is given."

In *Smith v. State Ex. Rel. Raburn,* 536 P.2d 976 (Okl. Cr. App. 1975), this Court, in accord with the Oklahoma Supreme Court, adopted the American Bar Association Project on Standards of Criminal Justice relating to the function of the trial judge during contempt proceedings. Standard No. 4 provides that "[b]efore imposing any punishment for contempt, the judge should give the offender notice of the charges and at least a summary opportunity to adduce evidence or argument relevant to guilt or punishment." We find that this standard of a summary opportunity to be heard is consonant with Article 2, Section 25 of the Oklahoma Constitution, in regard to direct contempt proceeding. The contemner should be given the opportunity at the hear-

ing to fully explain or defend his conduct. See, *State Ex Rel. Young v. Woodson,* 522 P.2d 1035 (Okl. 1974).

■ In this case, the appellant was properly before the trial court for direct contempt of court. We find that she was given an adequate opportunity to explain and defend her conduct. The trial judge, during the direct contempt proceeding, carefully questioned the appellant about her reasons for disrupting the earlier judicial proceedings. He also afforded her several opportunities to explain her conduct. We hold that this summary opportunity to be heard was adequate under the circumstances in this case.

We next direct our inquiry into whether the trial judge should have disqualified himself from the direct contempt proceeding. The American Bar Association Standards provide that:

[T]he judge before whom courtroom misconduct occurs may impose appropriate sanctions, including punishment for contempt, but should refer the matter to another judge, if his conduct was so integrated with the contempt that he contributed to it or was otherwise involved, or his objectivity can reasonably be questioned.

■ There are two primary considerations in evaluating whether the trial judge should disqualify himself from the contempt proceeding. First, the extent to which his conduct is integrated in the contempt. Second, whether the contempt mandates immediate action. If the trial judge waits until the end of the judicial proceeding to conduct the contempt hearing, generally, he should refer the matter to a fellow judge, where the contemptuous conduct involves a personal attack on his character. See the dissenting opinion in *Gilbert v. State,* 648 P.2d 1226 (Okl. Cr. 1982); see also, *Suter v. State,* 588 P.2d 578 (Okl. Cr. App. 1978).

■ In this case, the contemptuous conduct involved both a disruption of the judicial proceedings and a threat directed at the

trial judge. The only comment directed at the judge was the appellant's statement, "I am going to get him." We are of the opinion that this behavior did not amount to such a personal attack on the trial judge as to necessitate his disqualification. We find that the trial judge's conduct was not so significantly integrated in the contempt as to require another judge to take his place.

 Although not raised by appellate counsel, this Court finds that the imposition of a six (6) month county jail term is excessive under the facts presented in this case. See *Miskovsky v. State Ex Rel Jones,* 586 P.2d 1104 (Okl. Cr. App. 1978). We, therefore, modify the sentence to ten (10) days in the county jail. The judgment and sentence is AFFIRMED as MODIFIED.

BUSSEY, J., specially concurs.

BRETT, P.J., concurs in results.

BUSSEY, Judge, specially concurring:

I concur in the opinion of Judge Cornish, but would only modify the punishment from six (6) months to thirty (30) days.